**William BONIN, Petitioner,**

v.

**Daniel VASQUEZ, et al., Respondents.**

**No. CV 90–3589–ER.**

United States District Court,
C.D. California.

July 20, 1992.

Daniel E. Lungren, Atty. Gen. of the State of Cal., George Williamson, Chief Asst. Atty. Gen., Gary W. Schons, Senior Asst. Atty. Gen., Esteban Hernandez, Deputy Atty. Gen., Steven H. Zeigen, Supervising Deputy Atty. Gen., San Diego, Cal., for respondents.

Fern M. Laethem, State Public Defender, William D. Freeman, Deputy State Public Defender, Michael H. Roquemore, Deputy State Public Defender, Los Angeles, Cal., for petitioner BONIN.

## OPINION AND ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

RAFEEDIE, District Judge.

## I. INTRODUCTION

Petitioner, William George Bonin, has filed a petition for writ of habeas corpus challenging his 1983 convictions in Orange County on four counts of first degree murder and his subsequent death sentence. Prior to standing trial in Orange County, Bonin was convicted of ten counts of first degree murder in Los Angeles and received a death sentence from that jurisdiction. This order and opinion concerns only his Orange County case, though the Los Angeles case will be discussed as needed.[1]

Bonin claims that a total of 21 separate constitutional errors infected either the guilt phase or the penalty phase of his state trial. He argues that these errors require the Court to reverse either his convictions, his sentence, or both.

In reviewing this petition, the Court has read the entire state record,[2] as well as all of the pleadings and responsive documents filed by both parties. In addition, the Court conducted a three day evidentiary hearing on several of the issues involved in this case.

As detailed below, the Court has thoroughly examined each issue raised by Bonin. Having done so, the Court finds that Bonin has not presented any claim which warrants the granting of a writ of habeas corpus. Accordingly, the Court DENIES Bonin's petition for writ of habeas corpus.

## II. FACTS

This case involves the murder of four young males, Glenn Barker, Russell Rugh, Frank Fox, and Lawrence Sharp, whose bodies were found in different locations in Orange County. The victims ranged in age from fourteen to seventeen. All four victims died as a result of ligature strangulation. All of the bodies bore ligature markings on the neck and either the wrists or ankles, or both. All of the victims had been beaten around the face prior to their death. Several of the victims had also been beaten in the genital area. Evidence presented at the trial suggested that several of the victims had engaged in sexual activity immediately prior to their death. All of the bodies were nude, with no clothes or identification found in the vicinity of the bodies.

The prosecution's case consisted, broadly, of three types of evidence: similar crimes evidence based on the similarity between two of the Los Angeles murders[3] and the four Orange County murders, Bonin's confessions to a television reporter and an inmate, and testimony linking car-

---

**1.** Petitioner has also filed a writ of habeas corpus in his Los Angeles case. That petition is currently under submission before this Court.

**2.** The record consists of over 10,000 pages of reporter's transcripts, over 2,000 pages of clerk's transcripts, and the briefs filed during petition-

er's automatic appeal and three state habeas proceedings.

**3.** The details surrounding the murders in Los Angeles of Steven Wells and Charles Miranda were introduced into evidence at the Orange County trial.

pet fibers found on the victims' bodies to carpeting in the back of Bonin's van. To establish the similar crimes evidence, the prosecution relied heavily on the testimony of two of Bonin's former co-defendants, Greg Miley, who assisted Bonin in murdering Miranda, and James Munro, who participated in the murder of Wells.

After two days of deliberation, the jury found Bonin guilty of four counts of first degree murder with the special circumstance of multiple murder and four counts of robbery with the infliction of great bodily injury.

The prosecution presented additional evidence at the penalty phase: Five male witnesses testified that Bonin sexually assaulted them in the late 1960's and early 1970's; the custodian of medical records for Atascadero State Hospital discussed the contents of Bonin's medical records;[4] and witnesses testified about the murders of: Marcus Grabs (age 17), Donald Hyden (age 15), David Murillo, James Macabe (age 12), Ronald Gatlin (age 19), Harry Turner (age 14), Steven Wood (age 16), and Darin Kendrick (age 19).[5]

The defense presentation at the penalty phase consisted of further attacking the credibility of Munro, culling favorable information from the Atascadero records, and eliciting testimony from Bonin's mother and two brothers.

After two days of deliberation, the jury found death to be the appropriate punishment.

### III. THE ISSUES

Issue A: THE PUBLICATION RIGHTS AGREEMENT BETWEEN PETITIONER AND HIS TRIAL COUNSEL WAS A CONFLICT OF INTEREST THAT DENIED PETITIONER THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

#### PETITIONER'S CLAIM

Petitioner contends that he and his attorney, William Charvet, entered into a literary rights agreement before Charvet ever became his attorney. The agreement purportedly provided, among other things, that Charvet would represent Bonin at any and all of his trials in exchange for 40% interest in the proceeds of a book to be written about petitioner's life. The remaining profits would be shared by Mary Neiswender, the projected author of the book, and Bonin's mother. As part of the agreement, Charvet received the exclusive right to petitioner's life story and agreed to arrange for the book to be written and published.

After serving as retained counsel in Los Angeles, Charvet sought and received appointment as petitioner's attorney in Orange County. Thus, despite anticipated compensation from the literary rights agreement, Charvet also received payment from the Orange County court.

According to petitioner, the agreement gave Charvet a good reason for maximizing the publicity in petitioner's case since Charvet's financial reward was tied to the success of the book to be written about petitioner's life. As a result, Charvet's personal interests arising from the book agreement conflicted with his duty to effectively represent petitioner. Because of this conflict, petitioner believes that Charvet's performance suffered. Moreover, petitioner contends that he was neither advised of the dangers inherent in compensating an attorney with a literary rights agreement, nor did he waive his right to conflict-free representation.

Petitioner alleges that several trial decisions made by Charvet were motivated by the agreement and not by petitioner's best interest. Bonin's primary argument is that Charvet failed to present mitigating evidence because the court-appointed psychiatrist who was to testify about Bonin's history found out about the book agreement during a pre-penalty phase interview with

---

4. Following a 1969 arrest for sex offenses, Bonin was declared a mentally disordered sex offender and committed to Atascadero from mid-1969 to early-1971.

5. In Los Angeles, Bonin was convicted of murdering those eight males, as well as Miranda and Wells.

Bonin.[6] Charvet feared that the psychiatrist, Dr. Lunde, might mention the agreement in his testimony, so Charvet convinced Bonin to tell the court that he did not want Dr. Lunde to testify on his behalf at the penalty phase. In addition, Bonin believes that Charvet presented little mitigating evidence because he wanted Bonin to receive a death sentence rather than a sentence of life without parole because that would heighten public interest in Bonin's story.

## THE LAW

■ In order to establish a Sixth Amendment violation, a defendant who did not object to a possible conflict during trial must demonstrate that an actual conflict adversely affected his attorney's performance. *See Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980).[7] Once a defendant demonstrates an actual conflict and an adverse affect on performance, there is no further requirement that the defendant prove prejudice. *Id.* at 349, 100 S.Ct. at 1718–19. In other words, the defendant need not show that the conflict actually affected the outcome of the trial. However, a defendant cannot reverse a conviction merely on a showing of a possible conflict. *Id.* at 350, 100 S.Ct. at 1719.

## DISCUSSION

■ The Court held an evidentiary hearing on this issue. After listening to the testimony, observing the witnesses, examining the exhibits, and considering the briefs submitted, the Court concludes that Bonin and Charvet never had a literary rights agreement. Instead, the evidence repeatedly demonstrated that the relevant parties—Bonin, Charvet, and Neiswender—expressed interest in such an arrangement, but that expressions of interest never came to fruition. Without a literary rights agreement, there was no conflict of interest. Furthermore, the Court finds that Charvet had tactical reasons for deciding not to use the psychiatric testimony of Dr. Lunde and those reasons did not involve a perceived literary rights agreement.

Of the three parties to the purported agreement, only Neiswender and Charvet testified. Significantly, petitioner attended the hearing, but declined to testify, thereby leaving the vigorous and adamant denials of Charvet and Neiswender unrebutted by any percipient witness to the alleged agreement. Instead, petitioner relied upon a collection of witnesses each of whom appeared openly hostile to Charvet. These witnesses included Suzy Hood, Charvet's former client and ex-fiance; Tracy Stewart, Charvet's former junior associate and second counsel at petitioner's trial, who parted company with Charvet under unhappy circumstances and who remains angry at him; Melody Norris, Charvet's former secretary who expressed an obvious distaste for Charvet; Donald Okula, Stewart's current associate who did some work for Charvet during petitioner's trial and who expressed dislike for Charvet; and Richard Blum, a retired banker currently involved in litigation with Charvet.

Taking the collective testimony at face value, the evidence falls far short of proving by a preponderance of the evidence that Bonin and Charvet had a literary rights agreement prior to or during the trial. The evidence does suggest that all of the parties wanted to exploit Bonin's life story for money. However, desire and intent, with nothing more, do not create a conflict of interest. In addition, the Court finds highly persuasive the fact that as of the date of the evidentiary hearing nothing had been done by any of the relevant parties in furtherance of any oral or written literary rights agreement.

The Court concludes that at the time of the Orange County trial, Charvet was not a

---

**6.** The remaining attorney errors which petitioner attributes to the book agreement are discussed and rejected in issue D, below.

**7.** Although *Cuyler* involved a conflict based on one attorney representing several codefendants, the Ninth Circuit applied *Cuyler* when the conflict stemmed from an attorney's financial interest. *See United States v. Hearst,* 638 F.2d 1190, 1193 (9th Cir.1980), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981).

party to any literary rights agreement involving Bonin's life story. Without such an agreement, Bonin's claim that Charvet was laboring under a conflict of interest, as well as his ineffective assistance of counsel claim, must fail.

■ Independent of this finding, the Court finds that Charvet had a valid tactical reason for not presenting Dr. Lunde as a defense witness at the penalty phase of the Orange County trial. When Charvet learned that Dr. Lunde could not provide any objective psychiatric data, he pressed forward with his penalty phase theory that Bonin was not a danger to society when he was incarcerated. Taking its lead from *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984), the Court must be highly deferential to Charvet's performance at trial. In doing so, the Court finds that Bonin has not overcome the presumption that Charvet's decision not to use Dr. Lunde as a witness was "sound trial strategy." *Id.*

In sum, the Court finds insufficient factual support for petitioner's argument that he and Charvet had a literary rights agreement. In addition, the Court concludes that Charvet's decision not to continue with Dr. Lunde's examination was valid trial strategy that does not amount to ineffective assistance of counsel. Accordingly, the relief request by petitioner on this ground is denied.

Issue B: TRIAL COUNSEL'S PRIOR AT-TORNEY–CLIENT RELATION-SHIP WITH JAMES MUNRO, PETI-TIONER'S CO–DEFENDANT AND THE KEY PROSECUTION WIT-NESS AGAINST PETITIONER, CREATED A CONFLICT OF IN-TEREST THAT DENIED PETI-TIONER THE RIGHT TO THE EF-FECTIVE ASSISTANCE OF COUN-SEL

### PETITIONER'S CLAIM

Bonin alleges that prior to the Los Angeles trial and prior to Bonin's retention of Charvet as counsel, Charvet and Stewart met several times with James Munro regarding the possibility of representing him.

At the time of these meetings, Munro was Bonin's co-defendant in the murder of Steven Wells.

Apparently, the fact that Charvet and Munro met is not disputed. In a declaration filed with the Los Angeles trial court on September 19, 1981, prior to the Los Angeles trial, Charvet acknowledged that he and Stewart spoke with Munro on one or two occasions concerning the possibility of representing him. [LACT 1261–1262]. In addition, at the hearing on Bonin's motion to substitute Charvet as his attorney in Los Angeles, the prosecutor stated that Charvet had appeared at Munro's arraignment and told the court that he had talked with Munro and was available for appointment as his counsel. [LART 1/A–115].

These meetings, Bonin contends, created an attorney-client relationship between Charvet/Stewart and Munro. Because the attorney-client privilege prevented Charvet and Stewart from using any confidential information learned from Munro to help Bonin with his defense, Bonin maintains that Charvet and Stewart failed to thoroughly cross-examine and impeach Munro. Specifically, Bonin alleges that his attorneys did not suggest that Munro killed Wells without Bonin's help, or suggest that Munro's role and culpability were greater than he admitted to on direct examination. In addition, Bonin asserts that Munro may have provided Charvet and Stewart with information about him which caused them to be biased against him.

### THE LAW

The criteria needed to establish a Sixth Amendment violation due to an attorney's prior relationship with a key prosecution witness are the same as that needed to prove a conflict due to a literary rights agreement. See the discussion under issue A, above.

### DISCUSSION

■ The Court accepts, for the sake of discussion, that prior to the time Charvet represented Bonin, Charvet and Munro discussed the possibility of Charvet represent-

ing Munro in the murder of Steven Wells, and that these discussions established an attorney-client relationship between Charvet and Munro. Nevertheless, the Court finds that this conflict did not adversely affect Charvet's representation of Bonin.

A review of Munro's trial testimony reveals Munro's propensity to lie. Starting with the day of his arrest, Munro recounted the details of the Wells murder to either law enforcement officials or the court on at least eight different occasions. In doing so, Munro publicly described just about every possible scenario of events that could have occurred at the time of the Wells murder. The truth of that statement is best illustrated by a partial list of exhibits introduced at petitioner's Orange County trial:

1) A letter from the associate editor of Hustler/CHIC Magazines to Munro relating that he had received two letters from Munro, one stating that Munro had not killed anyone but Bonin had, and a second letter stating that Bonin did not kill Wells but Munro did (exhibit 31);

2) A note from Munro to Bonin offering to testify for Bonin if Bonin got Munro $20—$50 on his prison account (exhibit A);

3) A letter from Munro to Charvet dated 6/18/82 stating that he never saw Bonin kill anyone and he never killed anyone himself (exhibit C);

4) A letter from Munro to the trial judge from the Los Angeles trial stating that he lied on the witness stand in Los Angeles, he never saw Bonin kill anyone, and Bonin was always nice to him (exhibit D);

5) A note from Munro dated 12/28/82 stating that he lied in Los Angeles and that he never saw Bonin kill anyone (exhibit E);

6) A letter from Munro to Charvet dated 7/27/83 stating that he lied during his direct examination in Orange County and that he, not Bonin, killed Larry Sharp (exhibit F);

7) A letter from Munro to Judge Ricks dated 4/29/83 stating that he killed Wells (exhibit G);

8) A note from Munro dated 4/10/83 stating that he killed Harry Todd Turner (exhibit H).

After reviewing the trial transcripts, the Court finds that Charvet thoroughly and extensively cross-examined Munro in the Orange County case. In addition, Charvet further attacked Munro's credibility when he called Munro as a witness for the defense.

The Court is aware that the primary danger associated with the successive representation of a prosecution witness and a defendant is not what the attorney did, but rather what the attorney was prevented from doing as a result of the earlier representation. The Court concludes, however, that there is nothing that Charvet could have learned in his conversations with Munro that he could not have learned about anyway by virtue of Munro's testimony and other public utterances.[8] Charvet, of course, was free to use any information about Munro that he learned in a non-confidential manner, notwithstanding any earlier, allegedly confidential conversations with Munro.

Thus, even if petitioner could establish that Munro and Charvet had an attorney-client relationship, he has not proved that the relationship had an adverse affect on Charvet's performance at trial. Therefore, his claim of conflict must be denied.

Issue C: TRIAL COUNSEL'S DRUG ADDICTION DEPRIVED PETITIONER OF THE RIGHT TO COUNSEL, AND THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL

PETITIONER'S CLAIM

Petitioner alleges that throughout his trial, Charvet used and abused a number of prescription medications. The use of these drugs, argues petitioner, impaired Char-

---

8. Indeed, Charvet acknowledged this situation when he told the court in the Los Angeles case: "But as far as conflict of interest, I have nothing I can cross-examine Mr. Munro on, any facts contrary that is not in the public record, that he has given me as a private attorney." *People v. Bonin,* 47 Cal.3d 808, 254 Cal.Rptr. 298, 308, 765 P.2d 460, 470 (1989).

vet's ability to function as an effective trial attorney.

## THE LAW

A number of courts have held that an attorney's drug or alcohol addiction, without more, does not constitute ineffective assistance of counsel. For example, in *Berry v. King*, a Fifth Circuit death penalty case, the court stated: "under *Strickland*, the fact that an attorney used drugs is not, *in and of itself*, relevant to an ineffective assistance claim." 765 F.2d 451, 454 (5th Cir.1985) (emphasis in original), *cert. denied*, 476 U.S. 1164, 106 S.Ct. 2290, 90 L.Ed.2d 731 (1986). Instead, the inquiry is whether counsel's performance was deficient and whether the deficiency prejudiced the defendant. *Id. See also Fowler v. Parratt*, 682 F.2d 746, 750 (8th Cir.1982) (no rebuttable presumption that an alcoholic attorney provides ineffective representation); *Young v. Zant*, 727 F.2d 1489, 1493 (11th Cir.1984), *cert. denied*, 470 U.S. 1009, 105 S.Ct. 1371, 84 L.Ed.2d 390 (1985) (no support in the record that the trial attorney in a death penalty case was affected by his drug usage).

Other courts have used the *Berry* approach in assessing the impact of attorney drug or alcohol usage during trial. The Fourth Circuit found no ineffective assistance of counsel in a death penalty case where the attorney had frequent migraine headaches that required him to go to an emergency room nine times during the trial, left court during the trial in order to lie down, and took large quantities of prescription drugs. *See McDougall v. Dixon*, 921 F.2d 518 (4th Cir.1990), *cert. denied*, ⸺ U.S. ⸺, 111 S.Ct. 2840, 115 L.Ed.2d 1009 (1991). Regarding the attorney's drug usage, the court stated:

> There has been no showing that the legal drugs taken by [the attorney] during trial resulted in prejudice to the defendant. Many lawyers and judges are on various forms of medication while attending to their duties in the courtroom, but this is

not the test. The appellant must show that the medication affected his attorney in such a way that the attorney could not and did not render adequate legal assistance during the trial.

*McDougall*, 921 F.2d at 535.

The Eleventh Circuit has also affirmed such an approach. *See Hernandez v. Wainwright*, 634 F.Supp. 241, 245 (S.D.Fla. 1986), *aff'd without op*, 813 F.2d 409 (11th Cir.1987) ("An attorney's indulgence in alcohol is not in itself enough to constitute a *per se* Sixth Amendment violation."). The critical inquiry under *Strickland* is whether, regardless of the cause, counsel's performance was deficient and the deficiency was prejudicial. *Id.* While the Ninth Circuit has not directly addressed the issue of attorney alcohol and drug usage, it has adopted the reasoning of *Berry* in requiring that a defendant demonstrate prejudice when he accuses his attorney of ineffective assistance of counsel due to mental incompetence. *See Smith v. Ylst*, 826 F.2d 872, 876 (9th Cir.1987), *cert. denied*, 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 59 (1988) ("Rather than attempt to identify mental illnesses that would presumptively disable an attorney from conducting a criminal defense we believe *it is more prudent to evaluate the attorney's actual conduct of a trial* in light of allegations of mental incompetence.") (emphasis added).

## DISCUSSION

■ The Court notes that petitioner does not assert that Charvet's performance was deficient or prejudicial as a result of his drug usage.[9] Instead, petitioner, in essence, asks the Court to find that drug usage is *per se* evidence of ineffective assistance of counsel. No court has done so. Indeed, every federal court that has addressed this issue has expressly held that alcohol or drug use, without more, is not evidence of ineffective assistance of counsel. The Court declines to find that Charvet's alleged use of drugs during petition-

9. Even if the Court were to construe the petition as claiming that other cited examples of Charvet's alleged deficiencies were attributable to drug usage, this argument would still fail be-

cause, as discussed in detail in issue D, below, the other allegations of ineffective assistance of counsel are similarly without merit.

er's trial was *per se* ineffective assistance of counsel.

Issue D: TRIAL COUNSEL'S PERFORM-
ANCE DURING PETITIONER'S
TRIAL DEPRIVED PETITIONER
OF THE RIGHT TO THE EFFEC-
TIVE ASSISTANCE OF COUNSEL

PETITIONER'S CLAIM

Petitioner argues that a number of Charvet's acts and omissions during the trial rendered Charvet's performance constitutionally defective. Each act or omission will be discussed separately.

THE LAW

■ The Supreme Court set forth the components of an ineffective assistance of counsel analysis in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The benchmark for judging such a claim is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. at 686, 104 S.Ct. at 2064. The ultimate focus is on the fundamental fairness of the trial. *Id.* at 699, 104 S.Ct. at 2070–71.

■ An ineffective assistance of counsel analysis has two components: 1) was counsel's performance deficient; and 2) did the deficient performance prejudice the defendant. *Id.* at 687, 104 S.Ct. at 2064. In a capital case, this analysis applies to both the guilt phase and the penalty phase. *Id.* at 687–88, 104 S.Ct. at 2064–65.

■ To demonstrate deficiency in an attorney's performance, a defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. This requires a showing that the attorney's errors were so serious that the defendant was denied the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687, 104 S.Ct. at 2064.

■ Judicial scrutiny of attorney performance is highly deferential. *Id.* at 689, 104 S.Ct. at 2065. The court must make every effort to evaluate an attorney's conduct from the perspective of the time it occurred, not in hindsight, with all of its inherent distortions. *Id.* "A court must indulge a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*

■ Even if a professionally unreasonable error occurred, the error will not result in reversal if the error had no effect on the judgment of the case. *Id.* at 691, 104 S.Ct. at 2066–67. To prove prejudice, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. A reasonable probability is one that undermines confidence in the outcome. *Id.* "It is not enough for the defendant to show that the errors had some effect on the outcome of the proceeding." *Id.* at 693, 104 S.Ct. at 2067.

(1) Charvet Failed to Investigate Petitioner's Childhood

PETITIONER'S CLAIM

Petitioner maintains that he had a childhood marked by family violence and neglect. Petitioner suggests that Charvet would have discovered this had he employed an investigator in Connecticut where Bonin spent most of his childhood. Petitioner also faults Charvet for failing to adequately interview petitioner's mother and brothers and for failing to hire a childhood mitigation expert to testify about how abuse and neglect affect a child's development.

THE LAW

■ *Strickland* sets forth the standards for assessing an ineffective assistance of claiming alleging a failure to investigate: "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691, 104 S.Ct. at 2066.

968

The Ninth Circuit recognizes that in certain circumstances it is reasonable for an attorney not to present any or all mitigating evidence at the penalty phase. *See e.g. Deutscher v. Whitley,* 884 F.2d 1152, 1159 (9th Cir.1989) ("We do not hold that failure to present mitigating evidence at a capital sentencing hearing is always defective performance. In certain cases, counsel might reasonably decide that mitigation evidence would present more problems than it solves."), *vacated on other grounds,* — U.S. ——, 111 S.Ct. 1678, 114 L.Ed.2d 73 (1991).

## DISCUSSION

The Court granted petitioner an evidentiary hearing on this issue. Because the bulk of petitioner's evidence came from witnesses in Connecticut, the Court asked petitioner to submit declarations from those witnesses in lieu of live testimony.

■ The Court accepts, without hesitation, that Bonin experienced a childhood lacking in parental love, attention, and supervision. However, despite a multitude of assertions made by the testifying doctors, there is no competent, admissible evidence before the Court that Bonin was subject to or witnessed physical or sexual abuse as a child, save that evidence from the Atascadero records and Bonin's family that was admitted at the penalty phase of the trial. The declarants—Bonin's long-time neighbor, several elementary school classmates, and the family newspaper delivery boy— did not mention any type of abuse. Similarly, none of the declarants from the orphanage mentioned Bonin as either a victim of or a witness to the vividly described horrors of the orphanage.

After careful consideration, the Court concludes that the evidence presented at trial, coupled with the evidence that was properly presented to the Court at the evidentiary hearing, cannot and does not mitigate against the atrocities committed by Bonin. The Court in no way implies that this type of evidence—evidence of a childhood marked by abuse and neglect—is insignificant, or that it could never mitigate against the circumstances of a capital

crime. Rather, the Court finds that given the extremely aggravating circumstances of *this* case, there is no reasonable likelihood that the jury would have returned a sentence of life without parole had the information presented to the Court been available to the penalty phase jury.

Because the Court finds that petitioner has not satisfied the prejudice component of *Strickland,* the Court need not decide whether Charvet's failure to investigate all aspects of Bonin's childhood rendered Charvet's performance constitutionally infirm.

### (2) Charvet called James Munro, the Key Prosecution Witness, as a Defense Witness

#### PETITIONER'S CLAIM

Bonin claims that Charvet called James Munro as a defense witness in order to get a first-hand account of one of the murders before the public one more time.

#### DISCUSSION

A review of the trial transcripts shows that Bonin's allegation is factually incorrect. [OCRT 65/9107–9173]. While Charvet did call Munro as a defense witness, Munro never repeated the details of the murder while testifying for the defense. In fact, Charvet spent most of his direct examination discrediting Munro by repeatedly highlighting the numerous inconsistencies and lies in Munro's previous testimony. Bonin was not prejudiced by using Munro as a defense witness; therefore, there was no ineffective assistance of counsel.

### (3) Charvet Failed to Object to the Prosecutor's Leading Questions

#### PETITIONER'S CLAIM

■ Bonin alleges that Charvet failed to object to leading questions which elicited a witness' testimony that he was sodomized by petitioner. Bonin suggests that Charvet did not object because he wanted to publicize lurid testimony.

## DISCUSSION

A review of the record finds petitioner's claim to be meritless. The witness in question had been sodomized by Bonin in 1969 when he was twelve years old. The witness was reluctant to testify at the trial and a bench warrant was necessary to secure his appearance. [OCRT 65/9414]. In total, the witness' testimony consisted of answering five questions from the prosecutor.

Given the brevity and lack of details in the testimony, as well as the witness' known aversion to testifying, there is no basis for claiming that Charvet's failure to object to the leading questions was an attempt to elicit lurid testimony to promote publicity. Moreover, the content of the testimony was admissible. The only proper objection would have been to the form of the questions.

There existed both tactical and humanitarian reasons for not objecting to the prosecutor's brief use of leading questions. Accordingly, there is no basis for an ineffective assistance of counsel claim.

### (4) Charvet Introduced All of the Records From Petitioner's Stay at Atascadero State Hospital

#### PETITIONER'S CLAIM

 Initially, petitioner argued that Charvet erred by introducing the entire record of petitioner's commitment at Atascadero State Hospital because the records contained prejudicial material. Later, petitioner changed his claim to allege that Charvet provided ineffective assistance of counsel by failing to object to the inadmissible hearsay portions of the records.[10]

#### DISCUSSION

After a review of all of the relevant information on this issue, the Court concludes that petitioner has failed to rebut the presumption that Charvet's actions were a reasonable tactical decision. Charvet stressed his tactical reasoning on the

record [OCRT 67/9603–4 and 70/9963] and maintained that argument at the evidentiary hearing. "A tactical decision by counsel with which the defendant disagrees cannot form the basis of an ineffective assistance of counsel claim." *Guam v. Santos,* 741 F.2d 1167, 1169 (9th Cir.1984).

### (5) Charvet Expressed His Bias against Petitioner

#### PETITIONER'S CLAIM

 Bonin alleges that at an in-chambers conference held during the guilt phase of Bonin's trial, Charvet said that he was developing a bias toward Bonin and was having a hard time dealing with it. Bonin bases his allegation on a declaration written by Tracy Stewart and submitted as an exhibit in Bonin's first state habeas petition. Stewart's declaration also stated that the trial judge questioned Charvet about his feelings, and that Charvet told the judge that he wanted to let the court know of his feelings, but did not wish to withdraw from the case.

#### DISCUSSION

Bonin has not cited any case law supporting an argument that an attorney's off-the-record expression of ill feelings towards his client constitutes ineffective assistance of counsel. Indeed, Bonin fails to allege any deficiency of performance as a result of this alleged bias or any prejudice resulting from the bias. Consequently, there can be no finding of ineffective assistance of counsel.

### (6) Charvet Unexpectedly Failed to Appear on the Day a Key Prosecution Witness, David Lopez, Testified

#### PETITIONER'S CLAIM

 Bonin asserts that Charvet unexpectedly failed to appear in court on the day David Lopez, a key witness testified. This required an unprepared Tracy Stewart to cross-examine Lopez. This is the totality of Bonin's allegation. He neither con-

---

**10.** Petitioner also alleged that Charvet used the Atascadero records in lieu of Dr. Lunde's psychiatric testimony because of fears about exposing the literary rights agreement. The literary rights issue was found to be without merit, see issue A, above; therefore, the Court will not further examine this portion of petitioner's claim.

tends that Stewart's cross-examination was deficient, nor argues that some deficiency associated with Stewart's cross-examination caused him any prejudice.

### DISCUSSION

A review of the trial transcripts shows that the allegations made by Bonin are factually incorrect. First, Charvet's absence on the day of Lopez' testimony was not without advance notice. Charvet was not in court the two days prior to Lopez' testimony because of illness and each day, including the day Lopez testified, petitioner agreed to be represented solely by Stewart. [OCRT 58/8383–84, 8423; OCRT 59/8499; OCRT 60/8673–74]. After soloing for one and one-half days, Stewart had at least constructive notice that Charvet might also be absent on the day Lopez appeared.

Second, the transcripts indicate that Stewart was prepared to cross-examine Lopez, even if her preparation was less than optimal. [OCRT 60/8735]. Stewart was prepared enough that she asked the judge to set parameters on the scope of Lopez' testimony since she knew his testimony could potentially cover prejudicial and inadmissible subjects. Indeed, Stewart objected repeatedly when the prosecutor and Lopez exceeded the boundaries the judge had set for Lopez' direct examination.

The transcripts rebut any contention that Charvet's absence amounted to ineffective assistance of counsel.

### (7) Charvet Conducted the Direct Examination of a Defense Witness Procured and Prepared by Stewart

#### PETITIONER'S CLAIM

■ Bonin takes exception to Charvet's examination of an expert defense witness whom Stewart had obtained and prepared. Although Bonin labels this issue an ineffective assistance of counsel claim, he does not argue with any specificity that Charvet's examination of the witness was unreasonably deficient. In addition, he does not allege any prejudice resulting from Charvet's examination.

### DISCUSSION

A review of Charvet's examination of defense witness Ronald Macey belies any ineffective assistance of counsel claim. [OCRT 64/9090–9105]. Charvet qualified Macey as an expert witness and then elicited testimony casting doubt on the accuracy of the microscopic analysis of the carpet fibers conducted by a prosecution witness. Once again, petitioner has failed to establish either prong of the *Strickland* standard.

### (8) Charvet Withdrew his Request for Accomplice Instructions

#### PETITIONER'S CLAIM

■ Bonin states that for unexplained tactical reasons, Charvet withdrew his request for jury instructions about accomplice testimony, even though the only direct evidence linking Bonin to the murders was the testimony of two accomplices, Miley and Munro.

### THE LAW

There is case law holding that the failure to request accomplice instructions can fall below the range of reasonable assistance expected from trial counsel. *See e.g. United States v. Bosch,* 914 F.2d 1239, 1247 (9th Cir.1990); *United States v. Martin,* 489 F.2d 674, 677 (9th Cir.1973), *cert. denied,* 417 U.S. 948, 94 S.Ct. 3073, 41 L.Ed.2d 668 (1974). These same cases also hold, however, that the controlling issue is whether the attorney's failure to request the instructions prejudiced the defendant.

In assessing prejudice, the reviewing court should consider such factors as whether the accomplice's testimony was corroborated, whether the trial court gave general credibility instructions, and whether defense counsel questioned the accomplices' credibility during closing argument. *Bosch,* 914 F.2d at 1248. A court can also weigh such additional factors as whether defense counsel attacked the accomplice's credibility during cross-examination or called any witnesses to rebut the accomplice's testimony. *Martin,* 489 F.2d at 677.

## DISCUSSION

Charvet acknowledged, on the record, that he decided to withdraw the accomplice instructions for tactical purposes:

At this time, I wish for trial tactic purposes to withdraw 3.10, 3.11, 3.13, 3.18, and 3.19.[11]

... All of these are based on the—some five hours yesterday, the time at my office, and the discussion we had this morning regarding trial tactics and the ability of my argument to the jury.

[OCRT 65/9183].

While Charvet did not discuss the particulars of his trial tactics on the record, a review of Charvet's closing argument suggests that Charvet's trial tactic was to discredit Miley and Munro's testimony, rather than acknowledging to the jury through accomplice instructions that Bonin participated in the murders.

In a nutshell, Charvet's defense theory was that the only evidence against Bonin was similar crimes evidence. To convict on similar crimes evidence, the jury had to believe that Bonin committed the other crimes. To believe that Bonin committed the other crimes, the jury had to believe the testimony of Miley and Munro. To shake the jury's belief in Miley and Munro, Charvet attacked their testimony. He pointed out their lies, their inconsistencies, and their incentive to point the finger at Bonin.

Central to the prosecution's case was whether the jury would believe the testimony of Miley and Munro. If the jury deemed their testimony credible, Bonin would likely be convicted. If their testimony was discredited, then a reasonable doubt might prevail.

Charvet stressed the credibility argument both in cross-examination and in closing argument. He repeatedly attacked Munro's veracity. He highlighted the deal

Miley received in exchange for his testimony. The theme of his closing was that Miley and Munro's accounts of what occurred lacked credibility. In addition, the judge instructed the jury on assessing the credibility of witnesses. Accomplice instructions would not have aided Charvet's strategy. Indeed, had the jury not believed Miley and Munro, Bonin would have been better off without the accomplice instructions.

Bonin cannot show that there is a reasonable probability that but for Charvet's failure to request the accomplice instructions, the result of his trial would have been different. Accordingly, he has not met the criteria for proving an ineffective assistance of counsel claim. The question of whether Charvet's action fell below the standard of competence expected of attorneys need not be reached in light of the lack of prejudice to Bonin.

(9) Charvet Failed to Permit a Psychiatrist, Dr. Lunde, to Complete His Examination of Petitioner

This issue was discussed and rejected under Issue A, above.

(10) At the Time of Trial, Charvet was Addicted to Prescription Pain Medication that Affected his Judgment

This issue was discussed and rejected under Issue C, above.

## Issue E: THE STATE MANUFACTURED AND USED PERJURED TESTIMONY TO CONVICT PETITIONER

### PETITIONER'S CLAIM

Bonin alleges that perjured testimony was used to convict him and to sentence him to death in violation of his right to due process. Specifically, Bonin argues that a witness at his trial, Jimmy Lee Barnes,

---

11. These numbers refer to CALJIC instructions. All six instructions concern accomplice testimony: Instruction 3.10 defines accomplice. Instruction 3.11 requires accomplice testimony to be corroborated before a jury can convict on the basis of the accomplice's testimony. Instruction 3.12 describes the sufficiency of the evidence needed to corroborate the accomplice testimony. Instruction 3.13 forbids the corroboration of one accomplice's testimony with the testimony of another accomplice. Instruction 3.18 warns that the testimony of an accomplice should be viewed with distrust. Instruction 3.19 states that the defendant has the burden of proving by a preponderance of the evidence that the witness was an accomplice.

fabricated his testimony at the request of a Los Angeles County Sheriff Deputy. Bonin's allegation that Barnes perjured himself comes from a declaration signed by Barnes, using the name Thomas Allen Porter, that was attached to Bonin's second state habeas. Barnes wrote the declaration in July 1989, six years after he testified at Bonin's trial.

## THE LAW

■ If a prosecutor knowingly uses perjured testimony or knowingly fails to disclose that testimony used was false, then a conviction must be set aside if "there is any reasonable likelihood that the false testimony could have affected the jury verdict." *United States v. Endicott,* 869 F.2d 452, 455 (9th Cir.1989), *citing, United States v. Bagley,* 473 U.S. 667, 678–80, 105 S.Ct. 3375, 3381–83, 87 L.Ed.2d 481 (1985).

■ On the other hand, if the prosecutor was unaware of the perjury, then newly discovered evidence of perjury warrants a new trial only when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Endicott,* 869 F.2d 452, 455 (9th Cir.1989), *citing, United States v. Bagley,* 473 U.S. 667, 678–80, 105 S.Ct. 3375, 3381–83, 87 L.Ed.2d 481 (1985).

Bonin cites a number of cases where a conviction was reversed due to the bad conduct of the prosecutor. In each of these cases however, the conduct in question related either to a key witness or a key piece of evidence. For example, in *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Court reversed a conviction after a *key witness* who was promised immunity by one Assistant United States Attorney, denied on the witness stand to another Assistant United States Attorney that any offer of immunity had been made to him. In a similar case, the *principal witness* in a murder trial lied on the witness stand about not receiving any promises of leniency even though the

prosecutor trying the case was the person who offered the witness leniency. *See Napue v. Illinois,* 360 U.S. 264, 265, 79 S.Ct. 1173, 1175, 3 L.Ed.2d 1217 (1959). The Court also reversed a conviction when the prosecution knowingly presented false testimony about the *key piece of evidence* linking the defendant to a murder. *See Miller v. Pate,* 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967).

## DISCUSSION

■ The prosecution called Barnes to testify near the end of the prosecution's case. Barnes testified that he and Bonin were in custody together in the Los Angeles County Jail during October and November 1981. Barnes stated that Bonin told him something about a van, about taking a stake and hammering it up somebody's rectum, and tying somebody up and strangling him with a t-shirt. When pressed for details, Barnes could not remember if Bonin ever told him that he tied up young boys and put them in his van. He did remember, however, that Bonin admitted killing some boys.

On cross-examination, Barnes was unable to supply any details about his conversations with Bonin. He could not recall when the conversations occurred, how long they lasted, or how many conversations he and Bonin had.

In resolving this issue, the Court need not determine whether Barnes lied or whether the prosecutor knew of the perjury. In contrast to the cases discussed above, Barnes' testimony was a very small and insignificant part of Bonin's trial. His direct examination took only four pages and his entire appearance covered only 21 pages out of 2000 pages of actual trial testimony.

Viewed in the context of the entire case against Bonin, Barnes' testimony added nothing new. Another witness, David Lopez, had already testified that Bonin admitted to him that he killed the four Orange County boys. Barnes' very brief mention of Bonin hammering a stake up a boy's rectum was never corroborated by any other witness and no evidence was presented

that any victim had a stake up his rectum. Moreover, Barnes' frequent inability to remember any details makes it reasonably likely that the jury found Barnes to be a less than credible witness. Finally, the prosecutor never mentioned Barnes or Barnes' testimony in his closing argument in the guilt phase or in the penalty phase.

In addition to Barnes' lack of strength as a witness, there was substantial evidence introduced at trial to support Bonin's convictions on four counts of first degree murder. Petitioner cannot demonstrated that there was any reasonable likelihood that Barnes' testimony could have affected the jury verdict. Thus, there is no basis for a reversal even if Barnes committed perjury.

### Issue F: THE DENIAL OF PETITIONER'S MOTION FOR A CHANGE OF VENUE DEPRIVED HIM OF HIS RIGHT TO A FAIR TRIAL

#### PETITIONER'S CLAIM

Petitioner asserts that the trial court's denial of his motion for change of venue due to extensive pretrial publicity denied him his right to a fair trial before an impartial trier of fact and deprived him of his right to a reliable death sentence.

Petitioner recounts the wave of publicity that preceded his Orange County trial. During Bonin's murder spree, the media referred to the assailant as "the Freeway Killer." The media throughout Southern California, both television and newspaper, covered the story in detail both prior to and subsequent to Bonin's arrest. For example, the Los Angeles Times printed 107 stories connected with the murders between June 13, 1980 and August 17, 1982.

Petitioner describes the media coverage as "sensationalist, inflammatory, and calculated to appeal to the passions and prejudice of the reader." The coverage, according to petitioner, focused on four areas: 1) Bonin's confession to 21 murders; 2) the confessions of Bonin's co-defendants implicating Bonin; 3) Bonin's connection with the "Freeway Killer" label; and 4) the political squabbles between Orange County and Los Angeles about which jurisdiction would try Bonin first. In addition, the media discussed Bonin's prior record of sexual offenses and his prior incarceration in a mental facility.

Petitioner contends that this negative publicity, coupled with the short interval between the end of the Los Angeles trial and the beginning of jury voir dire in Orange County, led to a biased jury pool. The jury pool consisted of 204 prospective jurors. Sixty prospective jurors had knowledge of either Bonin's Los Angeles trial, conviction, or death sentence. One hundred fourteen prospective jurors had heard of the Freeway Killer and/or Bonin. Thirty-nine jurors were excused for cause or by stipulation because they believed Bonin was guilty or were otherwise biased against Bonin. Of the jurors finally impaneled, one juror knew that Bonin was convicted in Los Angeles, two jurors knew that Bonin stood trial in Los Angeles, and seven jurors had heard of the Freeway Killer and knew that the case involved a number of murders.

#### BACKGROUND

Prior to the Orange County trial, the trial court held a lengthy hearing on petitioner's change of venue motion. [OCRT 2/125–372]. The court allowed petitioner to play a number of tapes of previously aired news broadcasts concerning the Bonin case. Counsel was permitted to argue after each tape was played. In addition, petitioner submitted many newspaper stories about the case. Both the defense and the prosecution argued extensively about the motion.

Following the hearing, the court gave a detailed explanation on the record about why the motion was denied. [OCRT 2/364–372]. The judge discussed the criteria used to decide these motions and found: 1) the four murder counts were particularly grave offenses; 2) the population of Orange County was over two million; 3) the defendant and the victims had no particular status in the community; and 4) the case generated a great deal of media coverage. Based on these and other observations, the court concluded that there was an inadequate showing that petitioner could not re-

ceive a fair trial in Orange County. The judge particularly emphasized the size of the county and his belief that a jury could be found that had heard little or no information about the case.

Petitioner renewed his change of venue motion following jury impanelment. After briefing and argument, the court stated:

> The court has examined the transcripts relating to the various prospective jurors. The court has reached the determination that there does not exist a reasonable likelihood that in the absence of a change of venue the defendant could not obtain a fair trial in this particular county.

[OCRT 50/7489].

### THE LAW

The presence of juror bias is a factual determination to which the presumption of correctness under 28 U.S.C. § 2254(d) applies. *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir.1988), *cert. denied*, 493 U.S. 1051, 110 S.Ct. 854, 107 L.Ed.2d 848 (1990).

Before proceeding to the merits of this issue, the Court had to determine whether the production of further state court records was necessary. At one time, the Ninth Circuit required a federal district court reviewing a change of venue issue to examine not only the transcripts of jury voir dire, but also the exhibits introduced at the hearing on pretrial publicity. *See Harris v. Pulley*, 692 F.2d 1189 (9th Cir. 1982) (per curiam), *rev'd on other grounds*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

A subsequent *en banc* panel of the Ninth Circuit modified this position. *See Austad v. Risley*, 761 F.2d 1348 (9th Cir.) (*en banc*), *cert. denied*, 474 U.S. 856, 106 S.Ct. 163, 88 L.Ed.2d 135 (1985). In *Austad*, the court held that the district court does not have a *sua sponte* duty to obtain and examine parts of the state record unless the petitioner has demonstrated his inability to produce the record. *Id.* at 1354. If a petitioner who is able to produce the records fails to do so, "then he fails to carry his burden of establishing that the state court's factual determination is not

fairly supported by the record." *Id.* at 1353.

In reaching this decision, the *Austad* court relied on the language of 28 U.S.C. § 2254(e) which requires the petitioner either to produce the pertinent part of the record necessary for challenging the state court's factual determinations or to show that because of indigency or for some other reason, he is unable to produce the records. *Id.*

The Ninth Circuit recently reaffirmed *Austad. See Hart v. Stagner*, 935 F.2d 1007, 1013 n. 3 (9th Cir.1991) ("In evaluating the factual questions of whether individual jurors were prejudiced by pretrial publicity, the district court was not required to order production of the entire record unless Hart could not produce it himself.").

### DISCUSSION

■ *Austad* controls this case. The trial court ruled that petitioner could have a fair trial in Orange County, notwithstanding the extensive media coverage of the case. The court made this ruling after reading many newspaper articles, watching many hours of taped television newscasts, sitting through jury voir dire, and reviewing the transcripts of jury voir dire.

Petitioner has not provided the Court with any reason for overriding the presumption of correctness that attaches to the state court's decision. Petitioner has not raised any new facts not presented to the state court. In addition, petitioner has not lodged with the Court any of the newspaper articles or news tapes used as exhibits at the change of venue hearing in state court. Nor has petitioner sought the assistance of the Court in procuring these items.

Having reviewed the transcripts of the change of venue hearing and over 6000 pages of jury voir dire, the Court finds no basis for disagreeing with the finding of the state court that petitioner could receive a fair trial in Orange County. Accordingly, the Court adopts the finding of the state court and finds no merit to this claim.

Issue G: THE DENIAL OF PETITION-
ER'S MOTION FOR ADDITIONAL
PEREMPTORY CHALLENGES
DEPRIVED HIM OF HIS RIGHT
TO A FAIR TRIAL

### PETITIONER'S CLAIM

Petitioner contends that the trial court should have granted him more than twenty-six peremptory challenges because of the high percentage of jurors who had knowledge either of petitioner or the case. Because the defense was not allowed additional challenges, the prosecution was able to change the composition of the jury after the defense had exhausted its peremptories.

### THE LAW

The United States Supreme Court has succinctly described the constitutional status of peremptory challenges:

> Because peremptory challenges are a creature of statute and are not required by the Constitution [citations omitted], it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise [citations omitted]. As such, the "right" to peremptory challenges is "denied or impaired" only if the defendant does not receive that which state law provides.

*Ross v. Oklahoma*, 487 U.S. 81, 89, 108 S.Ct. 2273, 2278–79, 101 L.Ed.2d 80 (1988).

In California, the number of peremptory challenges are set forth in California Penal Code § 1070:

> (a) If the offense charged be punishable by death, or with imprisonment in the state prison for life, the defendant is entitled to 26 and the state to 26 peremptory challenges. Except as provided in subdivision (b), on a trial for any other offense, the defendant is entitled to 10 and the state to 10 peremptory challenges.

### BACKGROUND

Towards the latter part of general voir dire, but before the defense had used all of its peremptory challenges, Charvet requested an additional eight to ten peremptories. [OCRT 45/6750]. He made that request because of the large number of jurors who had knowledge either of petitioner or the case. The court, exercising its discretion, denied the request without prejudice to renew the motion at a future time. [OCRT 45/6751].

Shortly after Charvet made his request, the court reconsidered some challenges for cause that had been previously denied. Ultimately, the court dismissed for cause two jurors that had earlier been dismissed as a result of defense peremptories. Consequently, the court gave the defense two additional peremptories, giving the defense a total of 28 peremptories. [OCRT 47/6955].

After the defense exhausted its peremptories, the prosecution utilized three more peremptories before accepting the panel. Charvet never renewed his motion for additional peremptories.

### DISCUSSION

■ Under *Ross*, petitioner can establish a constitutional violation only if he can demonstrate that he was denied that which he was granted under state law. Petitioner was entitled to 26 peremptories. Petitioner received 26 peremptories, plus two additional peremptories. After exhausting his peremptory challenges, petitioner failed to renew a request for additional peremptories despite an explicit invitation from the trial court to do so. Under these facts, the Court finds no constitutional violation.[12]

Issue H: PROSECUTORIAL MISCON-
DUCT AT THE GUILT PHASE
### PETITIONER'S CLAIM

Petitioner maintains that the prosecutor intentionally elicited from prosecution witness, David Lopez, testimony that petition-

---

**12.** The Court further notes that California law grants capital defendants more than twice the number of peremptories afforded most other criminal defendants. These additional peremp-

tories go a long way towards assuaging petitioner's concern that capital cases garnering extensive media coverage require a large number of peremptories to ensure a fair trial.

er admitted killing 20 young males. According to petitioner, this inadmissible testimony prejudiced petitioner because the other evidence against him was largely circumstantial. Moreover, the testimony was enhanced because Lopez was a local television newscaster.

## THE LAW

Prosecutorial error, standing alone, does not violate the Constitution. Such error, however, may rise to the level of unconstitutionality if it "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). "To constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 3109, 97 L.Ed.2d 618 (1987) (citations omitted).

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). This is so because the "aim of due process 'is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.'" *Id., quoting, Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963).

## DISCUSSION

David Lopez was a television news reporter who talked with Bonin on several occasions. During the course of his conversations with Lopez, Bonin actually named three of the Orange County victims and admitted killing them. His admission to the murder of Frank Fox, however, occurred only because Fox's name was on a list of 21 murder victims and Bonin told Lopez that he murdered everyone on the list, except one person named Lundgren.

The defense feared that Lopez would discuss Bonin's confession to 20 murders during his testimony. This led to a discussion between the judge, the prosecutor, and Stewart, during which the prosecutor denied any intention of eliciting prejudicial testimony. [OCRT 60/8736]. In the end, the judge told the prosecutor that he could elicit testimony about the four Orange County victims and the two similar-crimes Los Angeles victims, but not about anyone else on the list. [OCRT 60/8738].

Despite the judge's warning, the prosecutor questioned Lopez about the list of victims. First, the prosecutor asked whether Bonin ever talked to him about Frank Fox. Lopez replied that Bonin never mentioned him by name. The prosecutor then asked Lopez whether Bonin ever discussed a list of homicide victims with him. Lopez stated that his answer would require him to mention names from the Los Angeles case and asked if he should still answer the question.

The prosecutor then asked specifically: "Did you talk to Mr. Bonin about a list of homicide victims that included the name of Frank Fox?" Lopez answered yes and added that 21 names were on the list.

The prosecutor next asked Lopez whether Bonin indicated whether or not he murdered the people on the list. After the judge overruled an objection made by Stewart, Lopez replied: "I asked him that point blank. And his answer was 'I killed all but one. . . .'"

After Lopez said this, Stewart immediately asked to approach the bench. Stewart expressed indignation about the prosecutor's questioning. The judge denied her oral motion for a mistrial. When Stewart questioned the judge about the prosecutor violating the judge's admonition, the judge replied: "That's all I wanted to get in. But, you know, he was asking about these and then you object; and I don't know how else he's going to get it in. This is the way it came about." The judge denied Stewart's motion to strike Lopez' testimony and found that the probative value far outweighed any prejudice.

For the sake of examining this issue, the Court assumes that the prosecutor's actions amounted to misconduct. The prose-

cutor's actions should be condemned. In a trial of this magnitude, the prosecutor should not have run roughshod over the limitations set by the trial judge. In the same vein, the judge should not have ignored such a blatant disregard for his previous ruling. Nevertheless, the United States Supreme Court has cautioned that the reviewing court must look not to the prosecutor's actions, but to the effect of the misconduct on the trial.

Accordingly, the Court has weighed the effect of Lopez' testimony on the outcome of the case to determine whether the inadmissible portion of Lopez' testimony rendered Bonin's trial unfair. In doing so, the Court was cognizant of the relevant evidence introduced at trial that established Bonin's guilt: Miley's testimony about Miranda's murder; Munro's testimony about Wells' murder; Bonin's admission to Lopez that he murdered the four Orange County boys and the two Los Angeles similar-crimes victims; and the unique carpet fibers that linked Bonin's van to the murders.

The Court concludes that the very brief testimony from Lopez that Bonin admitted killing all but one person listed on a piece of paper did not make Bonin's trial fundamentally unfair. The error, of course, was in the introduction of Bonin's confession to the additional 14 murders. It would take a great leap in logic to find that a jury would convict based on a confession to 20 murders, but would not convict if it only heard evidence that Bonin confessed to murdering the four victims for whom he was standing trial and the two similar-crimes victims. The prosecutor's actions, while reprehensible, did not result in a constitutional violation.

Issue I: DENIAL OF SECOND ARGUMENT TO PETITIONER'S ATTORNEY AT THE PENALTY PHASE

PETITIONER'S CLAIM

Petitioner takes exception to the trial court's refusal to allow petitioner's second

counsel, Tracy Stewart, her statutory right [13] to present argument at the penalty phase. This denial, petitioner argues, prevented the defense from presenting a full and unrestricted plea for petitioner's life. This violated his right to counsel, to the effective assistance of counsel, to due process, to equal protection, and to a reliable death judgment.

## THE LAW

*State Law Errors*

Every violation of state law does not provide a basis for granting relief under 28 U.S.C. § 2254. Pursuant to 28 U.S.C. 2254(a), a federal court shall entertain a petition for writ of habeas corpus only if the petitioner maintains that he is "in custody in violation of the Constitution or laws or treaties of the United States." Accordingly, errors of state law are not of concern to the federal court unless the error violates the United States Constitution. *See Oxborrow v. Eikenberry,* 877 F.2d 1395, 1400 (9th Cir.), *cert. denied,* 493 U.S. 942, 110 S.Ct. 344, 107 L.Ed.2d 332 (1989).

Moreover, "a mere error of state law is not a denial of due process;" otherwise, "every erroneous decision by a state court" would become a federal question. *Engle v. Isaac,* 456 U.S. 107, 121 n. 21, 102 S.Ct. 1558, 1568, n. 21, 71 L.Ed.2d 783 (1982). "Denial of due process in a criminal trial 'is the failure to observe that fundamental fairness essential to the very concept of justice.... [The Court] must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.'" *Kealohapauole v. Shimoda,* 800 F.2d 1463, 1465 (9th Cir.1986), *cert. denied,* 479 U.S. 1068, 107 S.Ct. 958, 93 L.Ed.2d 1006 (1987), *quoting, Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 289–90, 86 L.Ed. 166 (1941).

---

**13.** California Penal Code § 1095 provides:
If the offense charged is punishable by death, two counsel on each side may argue the cause. In any other case the court may, in its discretion, restrict the argument to one counsel on each side.

*Right to Present Closing Argument*

The right to the assistance of counsel has been defined to include the right to present a closing summation at the conclusion of a criminal trial. *See Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). That right is not unrestrained, however. "The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations." *Id.* at 862, 95 S.Ct. at 2555.

## DISCUSSION

■ At the conclusion of the evidentiary portion of the penalty phase, the prosecutor presented a closing summation followed by Charvet's closing. The prosecutor elected not to present a rebuttal. At that point, the judge questioned whether, under the circumstances, Stewart should be allowed to argue. [OCRT 71/10,122–10,-124]. The judge recognized that Stewart had a statutory right to argue, but was unclear whether the prosecutor's failure to rebut vitiated that right. Stewart suggested that she research the question overnight and report back in the morning. The prosecutor pushed to resolve the issue right then. Charvet interjected that he believed that two attorneys could argue only if the prosecutor made a rebuttal argument. After consulting the statute at issue, the judge ruled that Stewart could not argue since there was no rebuttal for which she could provide surrebuttal.

The Court recognizes that barring Stewart from arguing violated California Penal Code § 1095. As discussed above, the violation alone does not provide a basis for habeas relief. Petitioner maintains, however, that the denial of Stewart's argument rose to the level of a constitutional violation.

The Court finds that the trial court's actions did not violate petitioner's right to counsel, through either denial or infringement. As suggested by *Herring*, the Constitution guarantees only the right to present a closing argument; it does not guarantee unlimited closing argument. Petitioner had a closing argument; therefore,

he received all that the Constitution provides.

The Court further finds that the state law error rendered neither the trial, nor the death sentence, unfair. The California Supreme Court described Charvet's closing as a "full and unrestricted argument." *People v. Bonin*, 46 Cal.3d 659, 250 Cal.Rptr. 687, 706, 758 P.2d 1217, 1236–37 (1988). The California court also noted that Charvet found his argument to be sufficient and Stewart's argument to be dispensable. *Id.* A review of Charvet's closing argument convinces the Court that the state court's assessment is sound.

Petitioner has not provided the Court with any indication of what more Stewart could have added and the Court declines to speculate. Petitioner had a thorough closing argument that marshalled the evidence presented and offered the jury a number of reasons for not recommending that petitioner die. Given that, and the overwhelming aggravation present in this case, the Court finds that the absence of Stewart's argument did not violate due process or render petitioner's trial or sentence unfair.

Issue J: THE TRIAL COURT USED INAPPLICABLE MITIGATING FACTORS

### PETITIONER'S CLAIM

Petitioner finds error with the court's failure to delete inapplicable mitigating factors from the list of factors presented during jury instruction. Petitioner believes that the court's action, coupled with the prosecutor's argument that the absence of evidence on a mitigating factor transforms the factor into an aggravating factor, violated his right to due process and a reliable death verdict.

### THE LAW

*Deleting Inapplicable Factors*

The California Supreme Court has often held, as it did in Bonin's automatic appeal, that the trial court is under no obligation to delete inapplicable statutory factors when reading the list to the jury. *See Bonin*, 250 Cal.Rptr. at 708–09, 758 P.2d at 1238–40. Instructing the penalty phase jury on

the entire list of factors is customary in capital cases, as is reading to the jury the prefatory language instructing the jury to consider only those factors which are applicable. *See People v. Ghent,* 43 Cal.3d 739, 239 Cal.Rptr. 82, 107, 739 P.2d 1250, 1274–75 (1987).

Moreover, the California Supreme Court believes that the jury requires full knowledge of all of the factors in order to have the framework necessary for exercising discretion and placing the conduct of the defendant in the proper perspective. *See People v. Miranda,* 44 Cal.3d 57, 241 Cal. Rptr. 594, 624, 744 P.2d 1127, 1156–57 (1987). Similarly, the Ninth Circuit has concluded that instructing on possible mitigating factors for which the defendant has not presented any evidence does not violate any federal constitutional standards. *See Campbell v. Kincheloe,* 829 F.2d 1453, 1458–59 (9th Cir.1987). Finally, in setting forth the standards for a fair death penalty system, the United States Supreme Court has suggested that juries be given guidance about the factors which the state, representing society, deems relevant to making a sentencing decision. *See Gregg v. Georgia,* 428 U.S. 153, 192, 96 S.Ct. 2909, 2934, 49 L.Ed.2d 859 (1976).

*Prosecutorial Argument*

The United States Supreme Court has articulated the relationship between attorney argument and jury instructions:

[A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. Arguments of counsel which misstate the law are subject to objection and to correction by the court.

*Boyde v. California,* 494 U.S. 370, 384, 110 S.Ct. 1190, 1200, 108 L.Ed.2d 316 (1990).

DISCUSSION

*The Prosecutor*

During his closing summation at the penalty phase, the prosecutor reviewed the list of eleven statutory factors to be considered by the jury. Regarding the seven factors for which Bonin presented no evidence, the prosecutor argued that the absence of evidence supporting the factor turned the factor into one of aggravation. [OCRT 71/10,094–10,098].[14]

*The Instructions*

The trial judge included the following remarks in his instructions to the jury at the penalty phase:

[Your] duty is to apply the rules of law that I state to you to the facts as you determine them and, in this way, to arrive at your verdict. It is my duty in these instructions to explain to you the rules of law that apply to this case.

[OCRT 71/10,125].

Statements made by the attorneys during the trial are not evidence.

[OCRT 71/10,126].

In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case except as you may be hereafter instructed. You shall consider, take into account, and be guided by the following factors, *if applicable:* [the court then listed factors A through K].

[OCRT 71/10,135]. [Emphasis added].

*The California Supreme Court*

The three subparts of this issue were addressed by the California Supreme Court in petitioner's automatic appeal. First, the court held that the "if applicable" part of the jury instruction sufficiently notified the jury of the possibility that not all of the factors would be relevant. *Bonin,* 250 Cal. Rptr. at 708, 758 P.2d at 1238–39. Second, the court ruled that the "if applicable"

---

**14.** The seven factors were: being under the influence of extreme mental or emotional disturbance, the victims' participation in or consent to the criminal conduct, moral justification, extreme duress or domination by another person, mental disease or defect or intoxication, age, and being an accomplice.

instruction also conveyed to the jury that the absence of a factor rendered the factor inapplicable, rather than converting the absence into an aggravating factor. *Id.* at 708–09, 758 P.2d at 1239–40.

Third, the court construed petitioner's prosecutorial argument issue as a prosecutorial misconduct issue and then rejected the claim on procedural grounds. *Id.* at 709–10, 758 P.2d at 1239–41. Specifically, the court found that the issue was not preserved for review on appeal because petitioner did not make a timely objection and did not request that the jury be instructed to disregard the erroneous argument. *Id.* at 710, 758 P.2d at 1240–41. The court also dismissed the claim on the merits. In this regard, the court found that the court's instructions directed the jury to follow its rules, not the prosecutors. And, even if the jury did find the absence of factors to be aggravating, the effect was not prejudicial because the proper aggravation was overwhelming and the mitigation virtually nonexistent. *Id.* at 710, 758 P.2d at 1240–41.

 The Court concurs with the California Supreme Court's view that the trial court should not delete any statutory factors, but should instead list all of the factors and allow the jury to decide which factors are relevant and applicable. Thus, the court's failure to delete the inapplicable factors was not error.

 Petitioner takes the argument one step further, however. He argues that the prosecutor made the presence of inapplicable factors prejudicial by urging the jury to consider the absence of mitigating factors to be aggravating.

A close examination of the interplay between the three instructions quoted above rebuts any perceived error in petitioner's case. First, the jurors were told to apply the facts *to the rules of law given to them by the court.* Next, the court explained that *a prosecutor's statements are not evidence.* Finally, the jury was instructed to *consider only those factors which were applicable.*

There is no evidence before the Court that suggests that the jurors rejected the instructions given by the court and instead adopted the erroneous argument made by the prosecutor. The Court finds that it is not reasonable likely that the jury considered the inapplicable factors to be aggravating.

And even if the jurors did make this erroneous assumption, the Court finds the error to be nonprejudicial. As the California Supreme Court noted, the evidence in aggravation against petitioner was overwhelming. Petitioner murdered fourteen young males and sexually assaulted five others. The mitigation, on the other hand, was relatively minor. On these facts, the Court finds that there is little probability that the possible consideration of inapplicable aggravating factors tipped the scales in favor of the death sentence.

 Finally, the Court finds that any complaint about the prosecutor's argument is procedurally barred.

> In all cases in which a state prisoner has defaulted his claim in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice.

*Coleman v. Thompson,* —— U.S. ——, ——, 111 S.Ct. 2546, 2551, 115 L.Ed.2d 640, 669 (1991). The California Supreme Court provided an independent and adequate state procedural basis for rejecting petitioner's prosecutorial misconduct claim— petitioner failed to object at trial and thus failed to preserve the issue for appeal.

Issue K: AGGRAVATING FACTORS WERE ARTIFICIALLY INFLATED BY THE USE OF INVALID MULTIPLE MURDER SPECIAL CIRCUMSTANCES
PETITIONER'S CLAIM

Petitioner argues that his death sentence was obtained through the use of inappro-

priate aggravating factors—three special circumstances of multiple murder—thus rendering his death sentence unreliable.

## DISCUSSION

Petitioner was charged with four special circumstances of multiple murder, one for each murder charged. The jury found each special circumstance to be true. At the penalty phase, under factor (a), the jury was instructed to consider "the circumstances of the crime of which petitioner was convicted in the present proceeding and the *existence of any special circumstances found to be true....*" [OCRT 71/10,135] [emphasis added].

Later, on appeal, the California Supreme Court ruled that the use of more than one special circumstance of multiple murder was error. *Bonin*, 250 Cal.Rptr. at 703–04, 758 P.2d at 1234–35. As a result, the court vacated three of the special circumstances, but found the use of the four special circumstances to be harmless error. *Id.* Petitioner now contends that the jury's consideration under factor (a) of the three erroneous special circumstances, artificially inflated the aggravating circumstances of the crime.

██ The Court agrees that the jury's consideration of the three invalid multiple murder special circumstances was harmless error. In a sense, the special circumstances serve merely as a label for the circumstances of the crime. Take away the three special circumstances and the jury is still left to consider that petitioner murdered four young men. Any weight attaching to the label of "multiple murder special circumstances" cannot be deemed to be of major significance. Stated another way, given the nature and number of the offenses considered by the jury as aggravating factors, the application of three invalid special circumstances could not have resulted in an unreliable determination of death as the appropriate punishment.

**15.** This language has been changed. In accordance with subsequent rulings from the California Supreme Court, this instruction, now numbered 8.85, says, in relevant part:

Issue L: THE JURY WAS IMPROPERLY INSTRUCTED TO DOUBLE COUNT AGGRAVATING FACTORS

## PETITIONER'S CLAIM

Petitioner contends that the instructions given to the jury could have lead the jury to conclude that the circumstances of the crime should be considered twice, once under factor (a) and again under factor (b), thus improperly inflating the aggravating factors.

## THE LAW

The list of statutory factors are part of former CALJIC No. 8.84.1. The language of former CALJIC No. 8.84.1, taken verbatim from California Penal Code § 190.3, has been found to comport with the Constitution. *See e.g. Pulley v. Harris*, 465 U.S. 37, 51–52, 104 S.Ct. 871, 879–80, 79 L.Ed.2d 29 (1984) (citing the provisions of § 190.3 as one of the key features which keeps California's death penalty scheme from being arbitrary); *California v. Brown*, 479 U.S. 538, 540, 107 S.Ct. 837, 838–39, 93 L.Ed.2d 934 (1987) (approving of the statutory scheme set forth in § 190.3).

## DISCUSSION

The court instructed the jury as follows: You shall consider, take into account, and be guided by the following factors, if applicable:
(a) the circumstances of the crime of which petitioner was convicted in the present proceeding and the existence of any special circumstances found to be true;
(b) the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence; ... [15]
[OCRT 71/10,135].

Shortly after giving the above instruction, the judge gave the following instruction:

> You shall consider, take into account, and be guided by the following factors, if applicable:
> (b) The presence or absence of criminal activity by the defendant, *other than the crime[s]*

Evidence has been introduced for the purpose of showing that the defendant, William George Bonin, has committed the following criminal activity which involved the use or attempted use of force or violence or the express or implied threat to use force or violence: [the court listed the 10 murder victims from the Los Angeles case].

[OCRT 71/10,137–10,138].

■ Since the judge's instructions, as given, have been held to be constitutionally adequate, there can be no habeas relief on this claim. Moreover, the Court believes that the judge's subsequent instruction which tracked the language of factor (b) and then listed the ten Los Angeles murders, provided ample guidance to the jury as to which crimes to consider under factor (b). In sum, there is no reasonable likelihood that the jury interpreted factor (b) in an inappropriate manner.

Issue M: THE TRIAL COURT FAILED TO PROVIDE THE JURY WITH THE DEFINITION OF LIFE WITHOUT THE POSSIBILITY OF PAROLE

### PETITIONER'S CLAIM

Petitioner asserts that the term "life without the possibility of parole" ("LWOP") is widely misunderstood. According to petitioner, this was especially true of a number of venirepersons questioned in preparation for petitioner's trial. Despite the "common" misperception that LWOP provided for parole, the court refused to define the term for the jurors.

### DISCUSSION

■ The Court fails to see how this issue raises a federal question. The writ of habeas corpus is available only for errors arising under the Constitution or the

laws or treaties of the United States. 28 U.S.C. § 2254(a).

■ In addition, the Court fails to see any error. Petitioner never sought such an instruction from the trial court. None of the jurors impaneled in the case voiced any misperception about LWOP during jury voir dire. Given this state of circumstances, the Court finds that the lack of an instruction defining LWOP had no effect on the outcome of this case.

Issue N: THE JURY IMPROPERLY CONSIDERED PETITIONER'S AGE AS A FACTOR IN AGGRAVATION

### PETITIONER'S CLAIM

Petitioner argues that the jury instructions in conjunction with the arguments of the prosecutor led the jury to consider petitioner's age as an aggravating factor in violation of petitioner's right to due process, equal protection, and a reliable judgment of death.

### DISCUSSION

■ The prosecutor did argue that petitioner's age was a mitigating factor.[16] Nevertheless, as discussed in issue J, above, the Court finds that the prosecutor's erroneous statements were superceded by the judge's proper jury instructions. And even if the jury treated Bonin's age as an aggravating factor, it cannot reasonably be contemplated that the jury voted for death because Bonin was 32–33 years old at the time of the murders. The jury convicted petitioner of four murders and later heard about ten other murder convictions as well as five additional sexual assaults. When viewed against this background, petitioner's age could be of minimal import in the jury deliberation process. Accordingly, the Court finds that any error associated with

*for which the defendant has been tried in the present proceedings,* which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

California Jury Instructions, Criminal (5th Ed. 1988) (emphasis added).

Thus, the concern raised by petitioner in this issue should not pose a problem in future cases

because the relevant instruction has been clarified to prevent any misunderstanding by the jury.

16. The prosecutor said: "You can see from the Atascadero records that the defendant was born January 8, 1947.... The age in this case I would submit to you is an aggravating factor." [OCRT 71/10,096].

the age factor was a harmless error having no appreciable affect on the death verdict.

## Issue O: JURY'S SENTENCING DISCRETION

### PETITIONER'S CLAIM

Petitioner argues that both the jury instructions and the prosecutor's argument misled the jury as to the scope of its sentencing discretion.

### THE LAW

The United States Supreme Court addressed this issue in two similar cases. *See Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990); *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). *Blystone* involved a jury instruction similar to the instruction given at petitioner's trial.[17] 494 U.S. at 302, 110 S.Ct. at 1081. The Court, while noting that the instruction had some "mandatory aspects," nevertheless found the instruction constitutionally adequate because it called for the imposition of a death sentence only after a weighing of the aggravating and mitigating circumstances, rather than automatically imposing death based on the type of murder. *Id.* at 305, 110 S.Ct. at 1082–83. The individualized sentencing required by the Eighth Amendment occurs when the jury considers all relevant mitigating evidence. *Id.* at 307–308, 110 S.Ct. at 1083–84.

Likewise, relying on the reasoning set forth in *Blystone*, the Court found in *Boyde* that the jury instruction used in Boyde's case (CALJIC No. 8.84.2)[18] did not violate the Eighth Amendment because it still allowed each juror to make an individualized assessment of the defendant. *Boyde*, 494 U.S. at 376, 110 S.Ct. at 1195–96.

### DISCUSSION

In its jury instructions, the trial court listed the eleven factors to consider in sentencing. The court then said "if you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death."

This instruction followed the prosecutor's closing argument in which he told the jury:

> The applicable standard is "shall, shall." In other words, if you find as a group that the aggravating factors outweigh the mitigating, then the law requires that you shall return a death penalty. If you find as a group that the mitigating factors outweigh the aggravating, then the law requires that you shall return a verdict of life without parole.

> It doesn't give any discretion once you have found the factors either aggravating or mitigating. You have to do it one way or the other once you've found that to be true.

> The discretion will come in if you want to use discretion, comes in the last element of the criteria where you can consider anything else such as sympathy, pity, whatever.

[OCRT 71/10,074].

If petitioner only contended that the instruction took the sentencing discretion out of the jury's hand, then on the basis of *Boyde* and *Blystone* his argument could be dismissed without further discussion. Petitioner, however, takes the argument one step farther. He argues that the mechanical counting interpretation of the instruction was reinforced by the prosecutor's closing argument at the penalty phase.

The Court disagrees with petitioner's assessment of the prosecutor's argument. The Court's reading of the prosecutor's

---

**17.** The instruction stated: "the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance ... and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances."

**18.** The instruction given in Boyde's case stated: "if you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole."

closing does not support an argument that the jury was led to believe the deliberation process was merely a mechanical counting of the aggravating and mitigating factors. While the prosecutor did stress the "shall" aspect of the instructions, he also clearly informed the jury that there was a discretionary element to the deliberations. The prosecutor correctly stated that the jury could exercise discretion in considering the catch-all factor, factor (k).

The Court is of the opinion that neither the jury instructions, nor the prosecutor's argument, caused the jurors to labor under a misapprehension of their duties.

## Issue P: FAILURE TO REQUIRE FINDING BEYOND A REASONABLE DOUBT THAT AGGRAVATING CIRCUMSTANCES OUTWEIGHED MITIGATING FACTORS

### PETITIONER'S CLAIM

Petitioner believes that the jurors should have been instructed that they could impose death only if they were convinced beyond a reasonable doubt that aggravating circumstances outweighed mitigating, and if they personally believed death to be the appropriate punishment. Petitioner notes that in California, proof beyond a reasonable doubt is required to commit a narcotics offender or mentally disordered sex offender and to appoint a conservator, therefore, that quanta of proof should be required when a defendant's life is at stake. Failure to give this instruction denied petitioner due process, equal protection, and a reliable death verdict.

### THE LAW

A number of courts have examined this issue. A decade ago, in rejecting the contention that the Constitution requires the sentencer to find that aggravating factors outweigh mitigating factors beyond a reasonable doubt, the Ninth Circuit observed:

The United States Supreme Court has never stated that a beyond-a-reasonable-doubt standard is required when determining whether a death penalty should be imposed.... If the Supreme Court had intended for the burden in death-penalty cases to vary from the standard burden in all other criminal sentencing, it would have said so in one of the many modern cases dealing with the death penalty.

*Harris v. Pulley,* 692 F.2d 1189, 1195 (9th Cir.1982), *reversed on other grounds,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).[19]

Shortly thereafter, in *Zant v. Stephens,* 462 U.S. 862, 874, 103 S.Ct. 2733, 2741, 77 L.Ed.2d 235 (1983), the Court noted, without disapproval, that in Georgia, the jury is not instructed to balance aggravating and mitigating factors under any special standard. Indeed, the Court went on to state, "the Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances...." *Id.,* 462 U.S. at 890, 103 S.Ct. at 2750.

Similarly, the Eleventh Circuit, sitting *en banc,* has rejected this same argument. *See Ford v. Strickland,* 696 F.2d 804, 817–18 (11th Cir.) (*en banc*), *cert. denied,* 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983). The *Ford* court recognized that due process protects a defendant from "conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.* at 818, *quoting, In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970). The requirement that aggravating factors outweigh mitigating factors for a death sentence to be imposed is not an element of the crime of capital murder, however. *Id.* Therefore, due process does not come into play in weighing factors presented at a sentencing hearing held after conviction. *Ford,* 696 F.2d at 818.

In addition, the *Ford* court cautioned against confusing the existence of a fact

---

**19.** Despite the reversal, the United States Supreme Court noted, without disapproving, that the Ninth Circuit found there was no constitutional requirement that the appropriateness of the death sentence be established beyond a reasonable doubt. *Pulley v. Harris,* 465 U.S. 37, 41 n. 4, 104 S.Ct. 871, 874–75 n. 4, 79 L.Ed.2d 29 (1984).

with the relative weighing of facts. The existence of a fact can be demonstrated at different standards of proof. *Id.* The weighing of factors, however, "is not susceptible to proof by either party." *Id.*

## DISCUSSION

■ The Court adopts the reasoning and conclusions of the *Ford* court and holds that the Constitution does not require the instruction suggested by petitioner.

As for petitioner's equal protection argument, petitioner has failed to recognize a fundamental tenet of such analysis, namely, that the comparison must be made between similarly situated entities. Instead, petitioner has mixed apples and oranges. A convicted capital defendant awaiting sentencing is *not* similarly situated to a person being considered for commitment as a narcotics addict or a mentally disordered sex offender or a person being judged for a conservatorship. The Fourteenth Amendment does not require disparate groups to be treated the same. Accordingly, petitioner's claim based on equal protection is without merit.

## Issue Q: THE JURY COULD NOT EXERCISE MERCY

### PETITIONER'S CLAIM

Petitioner maintains that he had a state-created right to have the jury exercise mercy even if the aggravating factors outweighed the mitigating factors.[20] The failure to instruct the jury of this right violated due process, equal protection, and the right to a reliable death verdict.

### THE LAW

■ The United States Supreme Court addressed and rejected both aspects of peti-

**20.** Petitioner never names the source of this "state-created right."

**21.** Petitioner's claim can be broken down into two components: 1) the jury instructions did not allow for the consideration of mercy; and 2) the jury could not give a life without parole sentence if it found that the aggravating circumstances outweighed the mitigating.

**22.** Notably, the factor (k) instruction given in Boyde's case was even more restrictive than the

tioner's claim[21] in another death penalty case originating from California. *See Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). In *Boyde,* the petitioner argued that the eleven factors enumerated in CALJIC 8.84.1 did not allow the jury to consider mitigating factors not related to the crime. *Id.* at 378, 110 S.Ct. at 1196–97. Specifically, Boyde contended that factor (k), the catch-all factor, limited the jury's consideration to mitigation related to the crime. *Id.*

The Court disagreed with Boyde, finding no reasonable likelihood that the jurors interpreted factor (k) in a way that precluded the consideration of mitigating evidence unrelated to the crime. *Id.* at 381, 110 S.Ct. at 1198.[22]

Furthermore, the *Boyde* court held that there is no constitutional right to a life sentence if the jury finds that the aggravating factors outweigh the mitigating factors:

> Petitioner suggests that the jury must have freedom to decline to impose the death penalty even if the jury decides that the aggravating circumstances "outweigh" the mitigating circumstances. But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence "in an effort to achieve a more rational and equitable administration of the death penalty."

*Id.* at 377, 110 S.Ct. at 1196 (citation omitted).

## DISCUSSION

The judge instructed the jury:

instruction given in this case. Petitioner's jury was told explicitly to consider "any other factor offered by the defendant as a circumstance in mitigation." Boyde's jury was not given that part of the factor (k) instruction. *Boyde,* 494 U.S. at 378, 110 S.Ct. at 1196–97. Since the Court found no constitutional error with the more restrictive formulation of the factor (k) instruction, a fortiori there is no constitutional infirmity with the instruction given in this case.

You shall consider, take into account, and be guided by the following factors, if applicable:

\* \* \* \* \* \*

(k) Any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime or any other factor offered by the defendant as a circumstance in mitigation.

[OCRT 71/10,136].

■ This factor (k) instruction allowed the jurors to consider any mitigating factors, not just those related to the crime. Naturally, the consideration of mercy would be included. Therefore, petitioner was not deprived of the jury's consideration of mercy. In addition, petitioner had no constitutional right to a sentence other than death once the jury concluded that the factors in aggravation outweighed the factors in mitigation.

Issue R: THE STATE FAILED TO CONDUCT A COMPARATIVE SENTENCE REVIEW

PETITIONER'S CLAIM

Petitioner claims error with the state's failure to compare his sentence with sentences received by other defendants in like circumstances. Petitioner argues that California does these comparative sentence reviews in noncapital felony cases, therefore the failure to conduct a review in capital cases violates equal protection.

THE LAW

Comparative Sentence Review

In Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), the Court thoroughly evaluated the use of comparative sentence reviews in capital cases. The Court focused on the type of review proposed by petitioner—comparison of one case to similar cases to see if the sentence is proportionate. Using the Eighth Amendment as its springboard, the Court ruled that the Constitution does not require proportionality review in capital cases, provided the capital sentencing scheme provides sufficient procedural safeguards to ensure that the sentence is neither arbitrary nor capricious. Harris, 465 U.S. at 50–51, 104 S.Ct. at 879–80. After analyzing the 1977 California death penalty statute,[23] the Court concluded that the statute provided enough checks on arbitrariness that proportionality review was not necessary for the statute to pass constitutional muster. Id. at 51, 104 S.Ct. at 879–80.

Equal Protection

No doubt cognizant of the clear holding of Harris, petitioner makes a different argument, that he is treated differently than non-capital felons in violation of equal protection and the Fourteenth Amendment.

■ The Fourteenth Amendment does not prohibit states from treating different classes of persons differently. See Reed v. Reed, 404 U.S. 71, 75, 92 S.Ct. 251, 253–54, 30 L.Ed.2d 225 (1971). A legislative classification will be upheld if the classification is rationally related to a legitimate governmental interest. See U.S. Dept. of Agriculture v. Moreno, 413 U.S. 528, 533, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782 (1973).[24]

Comparative Review and Equal Protection

California has considered and rejected the notion that death row inmates must be granted a comparative sentence review because non-capital felons receive such a review. See People v. Allen, 42 Cal.3d 1222, 232 Cal.Rptr. 849, 890–91, 729 P.2d 115, 156–57 (1986).[25] In Allen, the California

23. Petitioner was sentenced under the 1978 California death penalty statute. However, the Harris court noted that the 1977 and 1978 provisions are substantially similar and that, for the most part, what was said in the opinion applied equally to the 1978 statute.

24. Rational basis is the appropriate standard to use in this case since no fundamental right or suspect class is at issue. Mayner v. Callahan, 873 F.2d 1300, 1302 (9th Cir.1989).

25. California Penal Code § 1170(f) requires the Board of Prison Terms to review every sentence imposed under the Determinate Sentencing Law within one year to determine through statistics and comparisons of comparable cases whether the sentence deviates from the expected range of sentences for the offense. Allen, 232 Cal.

Supreme Court articulated a number of reasons for differentiating between the two classes of convicts. First, the comparative sentence review would not work in capital cases because the sentencing is done by a jury, not a judge. A jury cannot be recalled at a later date to consider a new finding of disparity. *Allen*, 232 Cal.Rptr. at 890, 729 P.2d at 156. Second, capital defendants have a very narrow range of sentencing options: life without parole or death. Therefore, a finding that the death sentence was out of the expected range would make little sense. *Id.* Third, sentencing decisions in capital cases are made on the basis of moral standards and personal characteristics of defendants, among other factors. These types of considerations do not allow for valid inter-case comparisons. *Id.*

### DISCUSSION

▆▆ In addition to the reasons cited in *Allen*, the Court also recognizes that capital defendants receive numerous procedural safeguards that are not extended to non-capital defendants. Accordingly, non-capital defendants may require a proportionality check to ensure that a sentence is not arbitrary or capricious. Capital defendants, on the other hand, do not need this additional check.

The Court concludes that California has a rational basis for treating capital defendants differently from non-capital defendants when it comes to proportionality review. As a consequence, the Court finds that the absence of comparative sentence review for death row inmates does not violate the equal protection component of the Fourteenth Amendment.

Issue S: THE CALIFORNIA DEATH PENALTY STATUTE IS ARBITRARY

### PETITIONER'S CLAIM

Petitioner submits that the California death penalty statute fails to meet the minimum requirements of the Eighth and Fourteenth Amendments because it does not provide for: 1) specific and objective enumeration of aggravating and mitigating factors to guide the jury; 2) a requirement of written findings on any aggravating factors; 3) a requirement that the prosecution prove the existence of any aggravating factors beyond a reasonable doubt; 4) a requirement of jury unanimity regarding the presence of any aggravating factors; and 5) a requirement that jury determine beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating and that death is the appropriate penalty.

### THE LAW

*Constitutionality of the 1978 Death Penalty Statute*

The United States Supreme Court has approved of California's death penalty scheme. *See California v. Brown*, 479 U.S. 538, 540 n. *, 107 S.Ct. 837, 838 n. *, 93 L.Ed.2d 934 (1987).

*Enumerating the Aggravating and Mitigating Factors*

▆▆ Petitioner does not explain what this requirement means. In any event, the Court finds that the statutory factors set forth in CALJIC 8.84.1 are constitutionally sound. *See Boyde*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

*Requiring Written Findings*

▆▆ The Ninth Circuit has analyzed, and rejected, this contention. *See Harris v. Pulley*, 692 F.2d 1189, 1195 (9th Cir. 1982), *reversed on other grounds*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). In *Harris*, the court found that the constitutional requirements set forth in *Gregg v. Georgia*, 428 U.S. 153, 192, 96 S.Ct. 2909, 2934, 49 L.Ed.2d 859 (1976), and *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), are satisfied by the requirement that the trial judge articulate his or her findings as part of the automatic motion to modify sentence. *Id.*

Rptr. at 889, 729 P.2d at 155. If a sentence is found to be disparate, the Board notifies the sentencing judge who, in turn, holds a new sentencing hearing within 120 days to consider the Board's finding. *Id.*

Pursuant to California Penal Code § 190.4(e), when the jury has recommended a death penalty, the trial judge must "review the evidence ... and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the records the reasons for his findings." Accordingly, the judge's determinations on the record provide ample basis for appellate review. *Id.* at 1196. *See also Andrews v. Shulsen*, 802 F.2d 1256, 1261 (10th Cir.1986), *cert. denied*, 485 U.S. 919, 108 S.Ct. 1091, 99 L.Ed.2d 253 (1988) ("A jury need not make specific written findings of aggravating and mitigating circumstances for purposes of review if the sentencing mechanism is otherwise valid.").

Since the purpose behind a written finding requirement is to have an adequate record for appellate review, California's death penalty statute is not unconstitutional for requiring the judge, not the jury, to make the record for appellate review.

*Proving Aggravating Factors Beyond a Reasonable Doubt*

Neither the United States Supreme Court, nor the Ninth Circuit has specified the burden of proof to be applied to aggravating factors in a death penalty situation. In fact, the Ninth Circuit recently declined to decide whether federal constitutional law requires aggravating circumstances to be established beyond a reasonable doubt. *See Clark v. Ricketts*, 958 F.2d 851, 860 n. 6 (9th Cir.1992).[26]

An analogy can be drawn, however, to the burden of proof needed to establish enhancing factors for sentencing under the Federal Sentencing Guidelines. In a recent *en banc* decision, the Ninth Circuit held that due process does not require anything more than a preponderance of the evidence standard for establishing enhancing factors. *See United States v. Restrepo*, 946 F.2d 654 (9th Cir.1991) (*en banc*), *cert. denied*, —— U.S. ——, 112 S.Ct. 1564, 118 L.Ed.2d 211 (1992). In so holding, the

court noted that a sentencing factor is not an element of the offense requiring a heightened standard of proof. *Id.* at 656. The court further reasoned that the fully adversarial factfinding process and the right to appeal sentence findings adequately protect a convicted defendant's interests without requiring a higher standard of proof. *Id.* at 658.

■ The same reasoning applies in a death penalty case. An aggravating factor in the penalty phase of a capital case is not an element of the offense, but rather "a sentencing factor that comes into play only after the defendant has been found guilty." *Hildwin v. Florida*, 490 U.S. 638, 640, 109 S.Ct. 2055, 2057, 104 L.Ed.2d 728 (1989), *quoting, McMillan v. Pennsylvania*, 477 U.S. 79, 86, 106 S.Ct. 2411, 2416, 91 L.Ed.2d 67 (1986). In addition, the capital sentencing scheme in California provides numerous protections for the capital defendant. For example, the penalty phase is a fully adversarial proceeding. Moreover, a defendant sentenced to death has an automatic modification of sentence motion before the trial court, as well as an automatic appeal to the California Supreme Court.

In a similar vein, the court in *Restrepo* observed that the liberty interests involved at trial differ markedly from the liberty interests at sentencing. Once convicted, a defendant's interest is confined to a proper application of the statutory guidelines, nothing more. *Id.* Once again, the same argument applies to the penalty phase of a capital case.

Adopting the reasoning of *Restrepo*, the Court finds that the Constitution does not require that aggravating factors be proved beyond a reasonable doubt.

*Unanimity*

■ Petitioner further argues that the California death penalty statute is unconstitutional because it does not require the jury to find aggravating factors with unanimity. While there is much case law concerning the unconstitutionality of requiring

**26.** The court did not reach the issue because the state supreme court found that the aggravating

circumstances had been established beyond a reasonable doubt. *Clark*, 958 F.2d at 860 n. 6.

unanimity for finding mitigating factors,[27] there is a dearth of cases considering a unanimity requirement for aggravating factors.

One court correctly noted that the United States Supreme Court has never embraced such a requirement:

> However, the Virginia Supreme Court has held that in imposing the death penalty, following a capital murder conviction, the jury's verdict is not required to be unanimous as to the aggravating factors relied upon. [Citation omitted.] Nor does the United States Constitution require that the jury be unanimous. The Supreme Court has only held that the capital sentencing proceeding is to meet some of the requirements of a criminal trial, such as the right to counsel. [Citation omitted.] It has not held jury unanimity on the sub-determination of aggravation is a constitutional requirement.

*Briley v. Bass,* 584 F.Supp. 807, 819 (E.D.Va.), *aff'd,* 742 F.2d 155 (4th Cir.), *cert. denied,* 469 U.S. 893, 105 S.Ct. 270, 83 L.Ed.2d 206 (1984).

The Court holds that the Constitution does not require jury unanimity on aggravating factors. Unanimity plays a role in the final determination—whether aggravating factors outweigh mitigating factors. Beyond that, each juror need not agree what factors are aggravating. Constitutional concerns are met when each juror agrees that the aggravation, in toto, outweighs the mitigation in toto, or vice versa.

*Aggravating outweighing Mitigating Beyond a Reasonable Doubt*

This issue was discussed and rejected under issue P, above.

### DISCUSSION

Petitioner has not established any constitutional infirmity with California's death penalty statute. The Court concludes that the Constitution does not require the addi-

tion of any of the procedures suggested by petitioner.

**Issue T: THE CALIFORNIA SUPREME COURT FAILED TO HOLD AN EVIDENTIARY HEARING OR ISSUE WRITTEN FINDINGS ON PETITIONER'S STATE HABEAS CLAIMS**

### PETITIONER'S CLAIM

Petitioner asserts that the California Constitution requires the California Supreme Court to issue written findings when it determines "causes." Petitioner further asserts that his habeas claims were "causes" and thus, he had a state-created interest, protected by the Due Process Clause, to have his habeas claims decided with written findings. In addition, petitioner argues that the California Supreme Court was obligated to hold an evidentiary hearing to resolve factual issues raised in his habeas petitions.

### THE LAW

■ "[A] petition alleging errors in the state post-conviction review process is not addressable through habeas corpus proceedings." *Franzen v. Brinkman,* 877 F.2d 26 (9th Cir.), *cert. denied,* 493 U.S. 1012, 110 S.Ct. 574, 107 L.Ed.2d 569 (1989). The *Franzen* decision flows from the distinction made between direct appeals and collateral reviews. *See Pennsylvania v. Finley,* 481 U.S. 551, 556–57, 107 S.Ct. 1990, 1993–94, 95 L.Ed.2d 539 (1987).

### DISCUSSION

This issue, challenging as it does California's state habeas process, is not cognizable on federal habeas corpus.

**Issue U: CUMULATIVE ERROR**

### PETITIONER'S CLAIM

Petitioner argues that the errors set forth in issues A through T, above, when

---

**27.** *See e.g. Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) ("We conclude there is a substantial probability that reasonable jurors ... may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the exist-

ence of a particular such circumstance.... The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk").

**990**

viewed in the aggregate, rendered his trial and sentence unreliable.

### DISCUSSION

In reviewing this claim, the Court is mindful that the "perfect" trial is as elusive as the proverbial needle in a haystack. *See e.g. United States v. Hasting,* 461 U.S. 499, 509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983) ("[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the reality of human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and [the] Constitution does not guarantee such a trial.").

Petitioner's trial was not error-free. Nevertheless, having reviewed the entire state record, the Court is convinced that petitioner received a fundamentally fair trial.